FILED

2024 Apr-02  PM 02:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| MATTHEW R. BLOM, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 4:22-cv-00582-SGC |
| | ) |
| CITY OF GADSDEN, ALABAMA, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION & ORDER[1]

This is a collective action brought under the Fair Labor Standards Act (the "FLSA" or the "Act"). *See* 29 U.S.C. § 201, *et seq.* The plaintiffs are approximately 90 current and former firefighters, drivers, and commanders employed by the City of Gadsden, Alabama (the "City") in the Gadsden Fire Department (the "GFD").[2] The plaintiffs assert their claims against the City and its Personnel Director, Kerry Payne. Pending are four motions: (1) the plaintiffs' motion for partial summary judgment, (2) the defendants' motion for summary judgment, (3) the plaintiffs' motion for leave to file a response to the defendants' motion for summary judgment

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Docs. 14, 28).

[2] For ease of reference, the court will refer to the plaintiffs as current employees of the City. Some of the plaintiffs may work in positions within the GFD other than those of firefighter, driver, or commander. (*See* Doc. 20 at ¶ 5). The court's discussion is limited to firefighters, drivers, and commanders because those are the positions on which the parties themselves focus.

in excess of the page limit established by the court, and (4) the defendants' motion for leave to file a reply in support their motion for summary judgment in excess of the page limit established by the court.  (Docs. 37, 42, 56, 63).[3]  The court will grant the parties motions for leave to file excess pages.  The plaintiffs' motion for partial summary judgment is due to be denied.  The defendants' motion for summary judgment is due to be denied in part and granted in part.

## I. Material Facts[4]

The City has adopted a 28-day work period for its fire protection personnel.  (Doc. 38-1 at pp. 6-7).  Firefighters, drivers, and commanders work one 24-hour shift followed by 48 hours off duty before their next 24-hour shift begins.  (Doc. 38-6 at ¶ 2).  They are paid by the hour.  (Doc. 38-1 at p. 10).  Fire protection personnel who obtain certification as an emergency medical technician ("EMT") or paramedic receive an additional sum called "medic pay."  (Doc. 38-6 at ¶ 6).

Commanders rank above drivers in the GFD command structure, and drivers rank above firefighters.  When the absence of a GFD employee creates a vacancy in the command structure, a lower-ranking employee with the requisite qualifications

---

[3] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

[4] The following facts are undisputed, unless otherwise noted.  They are viewed in the light most favorable to the non-movant(s), with the non-movant(s) given the benefit of all reasonable inferences.  Disputed facts regarding the plaintiffs' overtime claim are included in the discussion section below.  The court elected not to include them in this section because they made it difficult to follow the overall narrative.

typically "steps up" to fill the vacancy.  For example, when a commander is absent, a qualified driver steps up to fill the vacancy in the commander position, and a qualified firefighter steps up to fill the vacancy created in the driver position.  The vacancy created in the firefighter position at the bottom of the command structure is filled by offering unscheduled overtime to GFD employees according to factors, including rank.  This means commanders and drivers may work "overtime under rank" as firefighters and, less frequently, commanders may work overtime under rank as drivers.  (Doc. 38-11 at pp. 18-20, 26; Doc. 38-20 at pp. 5-6).

A GFD employee who steps up to fill a vacancy in the command structure receives on top of his hourly rate an additional sum called "acting pay."  (Doc. 38-6 at ¶ 5).  A GFD employee who accepts a shift working overtime under rank is paid based on the hourly rate of the highest paid GFD employee of that rank: a commander working overtime under rank as a driver is paid based on the hourly rate of the highest paid driver, and a commander or driver working overtime under rank as a firefighter is paid based on the hourly rate of the highest paid firefighter.  (Doc. 38-1 at p. 8).

The plaintiffs commenced this action on May 5, 2022, claiming the City violated the FLSA's overtime provisions by failing to include medic pay and acting pay in the calculation of their "regular rates" and basing their pay for working overtime under rank on the hourly rate of the highest paid GFD employee of that

rank.  On or about June 1, 2022, plaintiff Josh Nabors made a social media post criticizing the City's administration and expressing his belief that, when people in the administration were "caught," they would "serve time in federal prison."  (Doc. 38-10 at p. 1).  In a comment on Nabors's post, plaintiff Jonathan Day stated he agreed and urged, "Lock them up."  (Doc. 38-10 at p. 1).  Contemporaneously, plaintiff Tony Calvert made posts referencing a "coverup" by the City and stating non-elected officials were running the City, which he thought was illegal.  (Doc. 28-21 at pp. 3-4).  GFD Chief Wil Reed issued Nabors, Day, and Calvert written warnings on June 9, 2022, on the ground their June 1, 2022 social media posts violated the GFD's social media policy.  (Doc. 38-10 at p.2; Doc. 38-19; Doc. 38-21 at p. 1).  The plaintiffs filed an amended complaint on August 11, 2022, in which Nabors, Day, and Calvert assert additional claims the warnings were retaliation for commencement of this action and exercising their First Amendment free speech rights.  Nabors, Day, and Calvert (the "retaliation plaintiffs") name both the City and Payne as defendants in relation to their retaliation claims.  (Doc. 20).

The City's social media policy prohibits GFD personnel from expressing themselves as private citizens on social media to the extent the expression "impair[s] or impede[s] the performance of duties, impair[s] discipline and harmony among coworkers, or negatively affect[s] the public perception of the department."  (Doc. 38-16 at p. 17).  The warnings issued to the retaliation plaintiffs state Payne had

complained to Chief Reed about the retaliation plaintiffs' June 1, 2022 social media posts, which had been construed as offensive to City employees and could cause disharmony within, and negatively affect public perception of, the GFD.  (Doc. 38-17 at pp. 1, 4-5).  Chief Reed relayed that Payne was considering initiating more serious disciplinary action if similar social media posts were made in the future.[5] Chief Reed testified Payne made a "heavy request" that he issue the warnings.  (Doc. 38-11 at p. 29-30).[6]  When asked whether he believed Nabors deserved a written warning for his post, Chief Reed took a long pause and was willing to say only that he believed it was "possible" the post violated the policy.  (Doc. 38-11 at pp. 30-31).

The warnings were placed in the retaliation plaintiffs' GFD files and their personnel files maintained by the City.  The warnings could be removed from the retaliation plaintiffs' GFD files after one year.  There is some question whether the warnings could be removed from the retaliation plaintiffs' personnel files maintained by the City, as well.  The retaliation plaintiffs testified they did not lose earnings or career opportunities because of the warnings.  Calvert speculated the warning could affect his eligibility for promotion to Assistant Chief, presumably only if it remained in one or both of his files.  (Doc. 38-9 at pp. 13-14; Doc. 38-18 at pp. 9-10; Doc. 38-

---

[5] An audio recording of this conversation was filed conventionally and delivered to the chambers of the undersigned on a thumb drive.

[6] Payne testified he simply showed Chief Reed the social media posts and advised him to review them against his policies.  (Doc. 38-28 at p. 13).

20 at pp. 11-12).  The retaliation plaintiffs have submitted social media posts made by other GFD employees, commenting on their poor pay and understaffing within the GFD and the opacity or indifference of City officials.  (Doc. 62).  The GFD employees who made these posts did not receive written warnings.[7]

## II. Standard of Review

Under Rule 56 of the *Federal Rules of Civil Procedure*, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact.  *Celotex Corp.*, 477 U.S. at 323.  If the moving party carries its initial burden, the non-movant must

---

[7] The retaliation plaintiffs offer as evidence in support of their retaliation claims statements made by City employees regarding the lawsuit.  The retaliation plaintiffs have not satisfied the court these statements are not hearsay, come within an exception to the hearsay rule, or could be reduced to admissible evidence at trial.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.  Nevertheless, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.") (internal quotation marks and citation omitted).  Therefore, the court will not consider the statements.

go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial. *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* at 248. If the evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted). All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1331 (11th Cir. 2005)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Id.*

## III. Discussion

### A. Overtime Claim

#### 1. Medic Pay and Acting Pay

The FLSA generally requires an employer to pay an employee at one-and-one-half times his "regular rate" for hours worked in excess of 40 each week. 29 U.S.C. § 207(a)(1). However, Congress recognized some jobs do not fit the 40-hour-workweek model. *Wethington v. City of Montgomery*, 935 F.2d 222, 224 (11th Cir. 1991). For example, firefighters often work several 24-hour shifts over the course of several weeks. *Id.* Therefore, the FLSA permits a public agency engaged in fire protection services to pay a firefighter (or employee engaged in any other type of fire protection activity) based on a work period of between 7 and 28 days. § 207(k). If, as relevant here, the agency adopts a 28-day work period, it must pay its employee at one-and-one-half times his "regular rate" for hours worked in excess of 212 each period. *Id.*; 29 C.F.R. § 553.230(a).[8]

An employee's regular rate is the "keystone" of an FLSA overtime claim. *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945). It is not a rate set by the employer. *Id.* at 424-25. It is an "actual fact" derived from a mathematical calculation, and its proper calculation is of "prime importance." *Id.* at

---

[8] Congress set the threshold for overtime pay in a 28-day period at 216 hours but gave the Department of Labor discretion to set a different threshold. § 207(k). The Department of Labor set the threshold at 212 hours. 29 C.F.R. § 553.230(a).

424-45. The calculation is performed by dividing an employee's total remuneration for a work period, less limited statutory exceptions that include overtime compensation, by the employee's non-overtime hours for that period. Otherwise put, an employee's non-overtime remuneration for a work period divided by his non-overtime hours for that period is his regular rate for the period. *Thompson v. Regions Sec. Servs., Inc.*, 67 F. 4th 1301, 1305 (11th Cir. 2023) (interpreting § 207(e) and citing *Walling*, 325 U.S. at 424, and *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 461, 464 (1948)); *see also Carballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1018 (N.D. Ill. 2013) (holding driving pay and acting pay were wage augments that had to be included in calculation of paramedics' regular rates); *Lemieux v. City of Holyoke*, 740 F. Supp. 2d 246, 253 n.2 (D. Mass. 2010) (noting defendants' concession EMT stipend was a wage augment that had to be included in calculation of firefighters' regular rates).

The plaintiffs contend the City violated the overtime provisions of the FLSA by failing to include medic pay and acting pay in the calculation of GFD employees' regular rates. The City does not contest that medic pay and acting pay are the types of remuneration that an employer must include in the calculation of employees' regular rates. It contests the plaintiffs' assertion it did not comply with the requirement. Each party seeks summary judgment on this prong of the plaintiffs' overtime claim. Whether the City included medic pay and acting pay in the

calculation of GFD employees' regular rates is a question of fact as to which the parties have submitted competing evidence.

The plaintiffs offer the deposition testimony of Susan Abraham, a retired Payroll Coordinator for the City, and a wage and hours data analysis performed by Richard DeBoard, a consultant employed by the plaintiffs' counsel. (Docs. 44-1, 44-17, 58-2).[9] Abraham testified the City does not include medic pay or acting pay in the calculation of GFD employees' regular rates. (Doc. 38-1 at pp. 8, 18-20).[10] The plaintiffs contend DeBoard's analysis confirms Abraham's deposition testimony.

The City claims DeBoard's analysis is flawed and offers an affidavit authored by Abraham after her deposition. (Doc. 38-6). The affidavit focuses on the earnings statements of one plaintiff (Matthew Blom) for one 28-day period. (*See* Doc. 44-20). Abraham attests the earnings statements show the City included medic pay and acting pay in the calculation of his regular rate for the period. (Doc. 38-6).

---

[9] Documents 44-1 and 58-2 are DeBoard's affidavits explaining the calculations he used in his analysis and where he recorded them on a Microsoft Excel spreadsheet. The analysis itself – the Microsoft Excel spreadsheet – was filed conventionally and delivered to the chambers of the undersigned on two thumb drives.

[10] Later in her deposition, Abraham testified she was not "one hundred percent sure" whether the City included medic pay in the calculation of GFD employees' regular rates. (Doc. 38-1 at pp. 18-20). Document 38-1 is a transcript of Abraham's deposition filed by the defendants. The court cites this submission when referring to specific pages because the page numbers are illegible on the transcript filed by the plaintiffs.

The discrepancies between Abraham's deposition testimony and affidavit and the City's challenge to DeBoard's analysis, present questions of fact that preclude summary judgment for any party.[11]   Moreover, Abraham's affidavit would not demonstrate the City's entitlement to summary judgment even in the absence of her earlier deposition testimony and DeBoard's analysis.  Abraham does not attest the City includes medic pay and acting pay in the calculation of every GFD employee's regular rate.  Otherwise put, she does not attest the inclusion of medic pay and acting pay in the calculation of a GFD employee's regular rate is a standard practice.  She merely attests to the pay one plaintiff received for one work period, which says nothing of the pay that employee received for other work periods or the pay any of the other plaintiffs received for any work period.

## 2. Overtime Under Rank Pay

As stated, a public agency engaged in fire protection services that adopts a 28-day work period generally must pay its employee one-and-one-half times his regular rate for hours worked in excess of 212 each 28-day period.  However, the agency

---

[11] The plaintiffs assert the court should disregard Abraham's affidavit as sham.  "When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  "This rule is applied sparingly because of the harsh effect it may have on a party's case."  *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987) (internal quotation marks omitted and alteration adopted).  The court does not view Abraham's deposition testimony and affidavit as inherently inconsistent.  The court views them as presenting the type of inconsistency the plaintiffs should test through cross-examination at trial.

may pay the employee at one-and-one-half times a different rate if the employee performs "two or more kinds of work" and the agency has reached an "agreement or understanding" with the employee that different rates will apply to the different kinds of work. § 207(g)(2). The agency bears the burden of proving the applicability of § 207(g)(2). *See Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001) (noting employer bears burden of proving applicability of FLSA exception).

The plaintiffs claim the City must use their "regular" hourly rates to pay them for working overtime under rank. The City contends that, pursuant to § 207(g)(2), it lawfully pays GFD employees working overtime under rank based on the hourly rates of the under-rank positions in which they are working. Each party seeks summary judgment in its favor in relation to this prong of the plaintiffs' overtime claim. As with the other prong of the plaintiffs' overtime claim, questions of fact preclude summary judgment for any party.

### a. Two or More Kinds of Work[12]

Neither the FLSA nor the applicable regulations define "two or more kinds of work." Case law interpreting the phrase is limited. The Eastern District of Pennsylvania has held employees who in addition to their "regular" jobs at a meat

---

[12] The City argues the Eleventh Circuit held in *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306 (11th Cir. 2007), that an employee need not perform two or more kinds of work for § 207(g)(2) to apply. The court reads *Allen* as holding an employee need not perform two or more kinds of work for an employer to pay different rates for the work and calculate overtime based on the blended rate. That is not what the City did here.

packing plant – butchering, bookkeeping, or repairing equipment and machinery – worked weekends at the plant painting, repairing pallets, cutting grass, and cleaning up were performing two kinds of work. *Hodgson v. Penn Packing Co.*, 335 F. Supp. 1015, 1021-22 (E.D. Pa. 1971). The Ninth Circuit has held logging and driving a crew bus to and from the logging site were two kinds of work. *McCrary v. Weyerhaeuser Co.*, 457 F.2d 862, 862 (9th Cir. 1972). And the Northern District of Illinois has held firefighting and fire inspecting were two kinds of work where the overlap between the duties of a firefighter and a fire inspector were insubstantial. *Mathias v. Addison Fire Prot. Dist. No. 1*, 43 F. Supp. 2d 916, 922-23 (N.D. Ill. 1999).

The City contends a GFD employee working overtime under rank performs two kinds of work because each category of GFD employee has distinct responsibilities. It has come forward with evidence to support its contention. That evidence is testimony explaining the distinct responsibilities of each category of GFD employee, both during "peace time" and when responding to calls for aid, and the testimony of at least one plaintiff that when a driver or commander works overtime under rank as a firefighter he performs the tasks of a firefighter instead of those of a driver or commander. (Doc. 38-9 at pp. 3, 11; Doc. 38-11 at p. 20). However, the plaintiffs contend a driver works as a driver and a commander works as a commander, even when slotted in a lower-ranked position on an overtime shift,

and they have submitted evidence to support their own contention.[13]  That evidence is affidavits of certain plaintiffs attesting that when a driver works overtime under rank as a firefighter or when a commander works overtime under rank either as a driver or a firefighter, he still is called on to use the knowledge and skills he has acquired in his higher-ranking position and, in some cases, may act as a *de facto* driver or commander.  (Docs. 44-2 – 44-11).  Blom, a GFD commander, additionally attests the GFD requires him to wear his commander uniform when working overtime under rank, so he is clearly identifiable as a commander even though technically serving in a lower-ranking position.  (Doc. 44-2 at ¶ 14).  The plaintiffs' evidence calls into doubt whether a GFD employee working overtime under rank performs two kids of work and creates a question of fact for resolution by a jury.

### b. Agreement or Understanding

Guidance regarding an "agreement or understanding" that satisfies § 207(g)(2), like guidance regarding the meaning of "two or more kinds of work," is

---

[13] The plaintiffs also contend a driver or commander working overtime under rank is performing the same kind of work he performs as a driver or commander because the primary responsibility of all GFD employees is to respond to emergency requests for aid.  The court rejects the plaintiffs' characterization of work performed by GFD employees during regularly scheduled shifts and when working overtime under rank.  By the logic underlying their characterization, it could be said the employees in *Hodgson* were performing the same work in their "regular" positions and on the weekends insofar as they were serving the needs of a meat packing plant; the employees in *McCrary* were performing the same work whether logging or driving a crew bus to and from the logging site insofar as the ultimate objective of the latter was the same as the former; and the employees in *Mathias* were performing the same work whether fighting fires or performing fire inspections to the extent the work was intended to protect the public from danger.  Defining work at this level of abstraction would swallow the exception created by § 207(g)(2).

limited.  The City contends something less than a formal document reducing a meeting of the minds to writing is sufficient.  The case law supports this view.  In *McCrary*, the Ninth Circuit held that, in the absence of a writing, employees' knowledge of the employer's method of computing overtime driving the crew bus and continued acceptance of the method evidenced an implied agreement or understanding that satisfied § 207(g)(2).  457 F.2d at 863-65; *see also Townsend v. Mercy Hosp. of Pittsburgh*, 862 F.2d 1009, 1011 (3d Cir. 1988) (holding each employee "was notified of and implicitly agreed to" a § 207(g)(2) arrangement).

The City has come forward with evidence that would support a reasonable inference its method of payment for working overtime under rank was well known to GFD employees and accepted by them.  Abraham testified "it's always been the practice" that a driver or commander working overtime under rank as a firefighter would be paid based on the hourly rate of the highest paid firefighter in the GFD and a commander working overtime under rank as a driver would be paid based on the hourly rate of the highest paid driver in the GFD.  (Doc. 38-1 at p. 8).  GFD Chief Wil Reed similarly testified "it's been that way forever," or at least "as long as [he] can remember."  (Doc. 38-11 at p. 20).  And at least one of the plaintiffs testified he knew that when he worked overtime under rank as a firefighter he would be paid based on a firefighter's hourly rate.  (doc. 38-20 at p. 6).

However, the plaintiffs have come forward with evidence they did not become aware of the City's method of payment for working overtime under rank until the retirement of Jeff Miller in 2016. They explain Miller was the highest paid firefighter on the force "[f]or many years" and had an hourly rate of pay higher than all drivers and equal to many commanders. This meant the plaintiffs did not realize they were not simply being paid their regular hourly rate. The highest paid firefighter in the GFD after Miller's retirement made approximately $2 dollars per hour less than Miller. The plaintiffs noticed the difference in their pay for working overtime under rank and, at that point, complained to the City. (Doc. 38-18 at p. 6; Doc. 58-1 at ¶¶ 12-19). The plaintiffs could not have accepted an arrangement of which they were not aware. Their evidence calls into doubt whether the City and GFD employees had an implied agreement or understanding regarding the City's method of payment for working overtime under rank and creates another question of fact for resolution by a jury.

### 3. Damages

Because questions of fact preclude entry of summary judgment in the plaintiffs' favor on their overtime claim, the court declines to address whether the City willfully violated the FLSA or whether the plaintiffs are entitled to liquidated damages equal in amount to the actual damages they claim. And because the court declines to address these questions, it also declines to address the plaintiffs'

objection to an FLSA compliance assessment of the GFD attached to Abraham's affidavit and Abraham's affidavit testimony regarding the assessment. (Doc. 38-6 at ¶ 14; Doc. 38-8; Doc. 57). The City offers the assessment to support its assertion it did not willfully violate the FLSA and the plaintiffs are not entitled to liquidated damages. The plaintiffs may renew their objection through a motion in limine filed before trial.

### B. FLSA Retaliation Claim

#### 1. Against Payne

Payne asserts he should be dismissed as a defendant in relation to the FLSA retaliation claim because his position as the City's Personnel Director "[does] not contain the required attributes" to be considered the retaliation plaintiffs' employer. A person may be held individually liable in relation to an FLSA retaliation claim if he qualifies as an "employer" within the meaning of the Act. *Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013). The definition of "employer" under the FLSA includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). To determine whether an individual qualifies as an FLSA employer, a court considers "the total employment situation." *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995). This is a fact-intensive inquiry. *See id.* (discussing factors considered). Payne's assertion he cannot be considered the retaliation plaintiffs' employer is conclusory. The

assertion is unaccompanied by any discussion of facts that support the assertion. The court will not dismiss the FLSA retaliation claim as to Payne on the ground he is not the retaliation plaintiffs' employer because Payne has not demonstrated his entitlement to summary judgment in his favor on that ground.

### 2. Generally

The FLSA protects an employee against retaliation for asserting his rights under the statute. *See* 29 U.S.C. § 215(a)(3). In the absence of direct evidence of retaliation, courts analyze FLSA retaliation claims using the burden-shifting framework applicable to retaliation claims brought under Title VII of the Civil Rights Act. *See, e.g., Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000). An employee must first establish a *prima facie* case of retaliation by showing (1) he engaged in activity protected under the FLSA, (2) he subsequently suffered material adverse action by his employer, and (3) there was a causal connection between his protected activity and the adverse action. *Id.* at 1342-43 (11th Cir. 2000). If the employee makes this showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its adverse action. *Id.* at 1343. The burden then shifts back to the employee to demonstrate the proffered reason is pretext for retaliation. *Id.* The defendants do not contest that the retaliation plaintiffs engaged in a protected activity under the FLSA when they commenced this action. They do challenge the remaining elements of the retaliation plaintiffs' *prima facie*

case, as well as their ability to show pretext for what the defendants assert is a legitimate, non-retaliatory reason for issuing the warnings.[14]

### a. Material Adverse Action

"[C]ourts have often relied on Title VII retaliation cases when assessing whether conduct constitutes material adverse action under the FLSA." *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 649 n.6 (11th Cir. 2019). The Eleventh Circuit used to require the same type of adverse action for discrimination and retaliation claims under Title VII: either an "ultimate employment decision," such as termination, or an action that, "in some substantial way, alter[ed] the employee's compensation, terms, conditions, or privileges of employment, deprive[d] him or her of employment opportunities, or adversely affect[ed] his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (internal quotation marks omitted). That changed with the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In *Burlington*, the Court broadened the type of employer conduct actionable as retaliation under Title VII. The Court explained that, in the retaliation context, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68. The Eleventh Circuit has recognized the

---

[14] The retaliation plaintiffs defend their FLSA retaliation claim but do not seek summary judgment in their favor on the claim.

"well might have dissuaded" standard is "decidedly more relaxed."  *Crawford*, 529

F.3d at 973.  The appellate court recently reaffirmed the "well might have dissuaded

standard" is applicable to all Title VII retaliation claims.  *Monaghan v. Worldpay*

*US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020).  The Eleventh Circuit also has applied

the "will might have dissuaded standard" to an FLSA retaliation claim.  *See Smith*,

940 F.3d at 648-49.

"[T]he 'well might have dissuaded' standard is contextual."  *Monaghan*, 955

F.3d at 862.  "[T]he significance of any given act of retaliation will often depend

upon the particular circumstances."  *Burlington*, 548 U.S. at 69.  " 'The real social

impact of workplace behavior often depends on a constellation of surrounding

circumstances, expectations, and relationships which are not fully captured by a

simple recitation of the words used or the physical acts performed.'"  *Id.* (quoting

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).  The

Eleventh Circuit has observed the Supreme Court's decision in *Burlington* "strongly

suggests that it is for a jury to decide whether anything more than the most petty and

trivial actions" satisfies the "well might have dissuaded" standard.  *Crawford*, 529

F.3d at 974.

The City argues a warning capable of expungement from an employee's

records after one year would not deter a reasonable employee from asserting his

FLSA rights.  As an initial matter, there is a question whether the warnings issued

to the retaliation plaintiffs can be expunged from both their GFD files and their personnel files maintained by the City after one year or, rather, only the former. Regardless, the City's argument overlooks the informal warning communicated to the retaliation plaintiffs with the formal warnings.  Chief Reed stated Payne was considering initiating more serious disciplinary action if similar social media posts were made in the future.  A formal warning – even one capable of expungement from an employee's records after one year – coupled with an informal warning more serious disciplinary action could be forthcoming is more than a petty or trivial action, and a reasonable jury could determine it would dissuade a reasonable employee from asserting his FLSA rights.

### b. Causal Connection

"[W]here a decision-maker becomes aware of protected conduct, a close temporal proximity between the decision-maker's acquisition of that knowledge and an adverse employment action will generally be enough to create a factual issue on the causation element."  *Singleton v. Pub. Health Tr. of Miami-Dade Cnty.*, 725 F. App'x 736, 738 (11th Cir. 2018).  "[T]he temporal proximity must be 'very close.'" *Id.* (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). "[The Eleventh Circuit] ha[s] held that a period as much as one month between the protected expression and the adverse action is not too protracted," *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citing *Wideman v. Wal-Mart Stores,*

*Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)), while "[t]he [Supreme] Court [has] cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection" *id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).

The City asserts the proximity of the warnings to the protected activity here (the filing of the complaint) is the only evidence of causation the plaintiffs have offered.  Even so, that is enough at this juncture because the temporary proximity – approximately one month – is sufficiently close.

### c. Pretext

The City in its briefing asserts the legitimate, non-retaliatory reason for issuing the warnings was the retaliation plaintiffs' implication of criminal conduct on the part of City employees.  As an initial matter, the court observes that while the City now claims the implication of criminality in the retaliation plaintiffs' social media posts was the reason for issuing the warnings, the explanation for the warnings given to the retaliation plaintiffs when the warnings were issued was that their social media posts violated the GFD's social media policy.  These explanations are somewhat different, and the one given in the City's briefing seems designed to circumvent the retaliation plaintiffs' pretext arguments: (1) that their social media posts did not violate the GFD's social media policy and (2) the policy has not been applied to other GFD personnel who have made social media posts that arguably

violate the policy.  The inconsistency in and of itself is evidence of pretext.  *See, e.g., Bechtel Const. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1995) (holding employer's shifting explanations for its actions showed pretext); *cf. Cleveland Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) (holding rational jury could infer from employer's shifting explanations for terminating employee that employee was terminated because of her disability).  Additionally, the plaintiffs have come forward with evidence to support their own pretext arguments.

To satisfy the third step of the burden-shifting framework, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies[,] or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (internal quotation marks omitted).  The "work rule" defense – that adverse action was taken against an employee because he violated an employer's rule – is "arguably pretextual" when a plaintiff submits evidence he did not violate the rule.  *Damon v. Fleming Supermarkets of Florida*, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999).  This does not mean an employer who takes adverse action against an employee after the employee engages in protected conduct based on the "mistaken but honest" belief the employee violated a work rule is liable for retaliation.  *Id.* at 1363 n.3.  "An employer 'may fire an employee for a good reason, a bad reason, a reason based on

erroneous facts, or for no reason at all, as long as its action is not for a [retaliatory] reason.'" *Id.* (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n.16 (11th Cir. 1998)).  It simply creates a jury question on the ultimate issue of retaliation. *Id.*

There is an element of subjectivity to the portion of the GFD's social media policy at issue.  Whether an employee's speech on social media "impair[]s . . . harmony among coworkers" or "negatively affect[s] the public perception of [the GFD] may differ from person to person.  Given the element of subjectivity, the court views Chief Reed's testimony to be the strongest evidence the retaliation plaintiffs' social media posts did not violate the GFD's social media policy.  Chief Reed testified Payne made a "heavy request" that he issue the warnings and, when asked whether he believed Nabors deserved a written warning for his post, took a long pause and was willing to say only that he believed it was "possible" the post violated the policy.  (Doc. 38-11 at pp. 29-31).

Inconsistent application of a policy also may demonstrate pretext.  *Williams v. City of Valdosta*, 689 F.2d 964, 975 (11th Cir. 1982).  The retaliation plaintiffs have submitted evidence that creates a question of fact as to whether the GFD social media policy was applied inconsistently.  That evidence is the social media posts made by other GFD personnel who did not receive written warnings for their posts.  (Doc. 62).  Considering the defendants' shifting explanations for the warnings issued

to the retaliation plaintiffs, together with evidence the retaliation plaintiffs' social media posts did not violate the GFD's social media policy and evidence social media posts made by other GFD employees did violate the GFD's social media policy but went unsanctioned, a reasonable jury could determine the reason for the warnings asserted by the defendants in this action is not believable.

### C. First Amendment Retaliation

The First Amendment prohibits a government official from retaliating against an individual for engaging in protected speech, whether the individual is a private citizen or a public employee. *Pickering v. Bd. of Ed. of Twp. High School Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). The Eleventh Circuit recently has acknowledged its caselaw regarding what type of adverse action will support a First Amendment retaliation claim brought by a public employee is "a bit muddled." *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021). In *Stavropoulos v. Firestone*, the court held an adverse action for purposes of a First Amendment retaliation claim brought by a public employee is one that "involve[s] an important condition of employment," such as termination, which it noted was a standard "constant" to the one then-employed in the context of a Title VII retaliation claim. 361 F.3d 610, 619-20 (11th Cir. 2004). More than a decade later, in *Bailey v. Wheeler*, the court applied to a First Amendment retaliation claim brought by a public employee an adverse action standard it had adopted in the context of a First

Amendment retaliation claim brought by a private citizen.  843 F.3d 473, 481 (11th Cir. 2016).  That standard asks whether the challenged action "would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005) (internal quotation marks omitted).

The court in *Bell* declined to resolve this "precedential conundrum" because it determined the First Amendment retaliation claim in that case failed under either standard.  6 F.4th at 1378.  However, it noted that in the absence of this "way out" it "would have [had] to apply *Stavropoulos* as the earlier decision, unless [it] concluded [*Stavropoulos*] ha[d] been abrogated by *Burlington*."  *Id.* (internal citation omitted).  As discussed, the Supreme Court in *Burlington* expanded employer conduct actionable as retaliation under Title VII to that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 68.

*Burlington* may have weakened *Stavropoulos*, but it did not directly overrule the case.  *See Garrett v. Univ. of Alabama at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003) ("While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point.").  The Eleventh Circuit noted in *Bell* that *Stavropoulos* "may be ripe for re-examination" on the basis of *Burlington*, 6 F.4th at 1378 n.2, but it did not conclude in that case that *Burlington* abrogated *Stavropoulos*.  Moreover, it has

not concluded since *Bell* that *Burlington* abrogated *Stavropoulos*. *Stavropoulos* remains the precedent this court must apply, unless and until the Supreme Court or the *en banc* Eleventh Circuit directly overrules it or concludes it has been abrogated by *Burlington*. *See In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) (explaining that under the appellate court's prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the appellate court] sitting *en banc*.") (internal quotation marks omitted); *Mosby v. City of Byron, Georgia*, 2021 WL 297129, at *4 (M.D. Ga. Jan. 28, 2021) ("It simply is not the place of a district court to decide when a circuit precedent is overruled or abrogated to the point that it is no longer binding on lower courts; that remains the exclusive domain for the circuit court."), *aff'd*, 2022 WL 1136835 (11th Cir. Apr. 18, 2022).

Under the *Stavropoulos* standard, an adverse action that will support a First Amendment retaliation claim brought by a public employee is one that "involve[s] an important condition of employment," such as termination. *Stavropoulos*, 361 F.3d at 619. Applying the *Stavropoulos* standard, the Eleventh Circuit has held reprimands and threats of suspension and job loss, both individually and collectively, are not adverse actions that will support a First Amendment retaliation claim insofar as they do not negatively affect an employee's salary, title, position, or job duties. *Akins v. Fulton Cnty., Georgia*, 420 F.3d 1293, 1300-02 (11th Cir. 2005). This

holding commands the conclusion the actions the retaliation plaintiffs challenge in this case fall short of satisfying the *Stavropoulos* standard. The retaliation plaintiffs testified they did not lose earnings or career opportunities because of the warnings, and Calvert's testimony the warning could affect his eligibility for promotion to Assistant Chief was speculation. Because the retaliation plaintiffs' First Amendment retaliation claim fails at this stage of the analysis, the court declines to address the other elements of a First Amendment retaliation claim, *see Moss v. City of Pembroke Pines*, 782 F.3d 613, 617-18 (11th Cir. 2015) (discussing elements), or Payne's assertion of qualified immunity in relation to the claim.

### D. Free Association Claim

The plaintiffs' amended complaint obliquely suggests they may assert a claim the defendants violated their First Amendment right to freedom of association. (Doc. 20). The defendants correctly observe the record lacks evidence the plaintiffs were punished for joining a union, collectively bargaining, or otherwise aligning themselves with like-minded individuals. *See O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1053-54 (11th Cir. 2022) (discussing associational conduct). The court additionally notes the plaintiffs have failed to respond to the defendants' argument any free association claim should be dismissed.

**IV. Conclusion**

The court **GRANTS** the parties' motions for leave to file excess pages.  (Docs. 56, 63).  For the reasons stated above, the court **DENIES** the plaintiffs' motion for partial summary judgment.  (Doc. 42).  The court **DENIES** the defendants' motion for summary judgment in part and **GRANTS** the motion in part.  (Doc. 37).  The court **DISMISSES** the First Amendment retaliation claim and free association claim **WITH PREJUDICE**.

**DONE** this 29th day of March, 2024.

_Staci G. Cornelius_
STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE